[Cite as *State v. McKenzie*, 2024-Ohio-2841.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio                                             Court of Appeals No.  S-23-029

     Appellee                                        Trial Court No.  22CR677

v.

Tony McKenzie                                       **DECISION AND JUDGMENT**

     Appellant                                       Decided:  July 26, 2024

* * * * *

Beth A. Tischler, Sandusky County Prosecuting Attorney, and
Alexis M. Otero, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}**  Following a bench trial, defendant-appellant, Tony McKenzie, appeals the

October 18, 2023 judgment of the Sandusky County Court of Common Pleas, convicting

him of felonious assault.  For the following reasons, we affirm the trial court judgment.

# I. Background

{¶ 2}   Tony McKenzie was charged with felonious assault, a violation of R.C. 2903.11(B)(1) and (D)(1)(a), a second-degree felony.  The State alleged that he engaged in sexual intercourse with A.U. without first disclosing to her that he had tested positive as a carrier of HIV, a virus that causes acquired immunodeficiency syndrome.

## A.  McKenzie moves to dismiss; the trial court denies his motion.

{¶ 3}   McKenzie moved to dismiss the charge against him.  He alleged that at all times relevant to the date of the alleged conduct, he was actively treating his HIV and was maintaining an undetectable viral load, which prevented him from transmitting HIV to a sexual partner.  He argued that R.C. 2903.11(B)(1) is unconstitutional as applied to him and is contrary to public policy.

{¶ 4}   First, McKenzie argued that as applied, R.C. 2903.11(B)(1) violates his right to Equal Protection under the law, guaranteed by the Fourteenth Amendment to the U.S. Constitution and Article I, § 2 of the Ohio Constitution, which require similarly-situated people to be treated similarly.  He also argued that it violates his right to freedom of speech under the First Amendment and Article I, § 11 of the Ohio Constitution.  McKenzie maintained that R.C. 2903.11(B)(1) implicates his fundamental right to the privacy of his medical history and compels speech (i.e., disclosure of his medical history to other persons).  He maintained that the statute could not withstand either strict scrutiny or a rational-basis analysis.

2.

**{¶ 5}** Second, McKenzie urged that R.C. 2903.11(B)(1) is contrary to public policy and undermines the legitimate public policy of preventing the spread of HIV by (1) criminalizing the behavior of and further stigmatizing persons with serious medical conditions; (2) failing to reflect significant biomedical advancements over the last 40 years for treating and preventing HIV; (3) deterring people from testing and seeking treatment for HIV; and (4) compelling disclosure of HIV-positive status even where the risk of transmission is negligible or nonexistent.

**{¶ 6}** The trial court denied McKenzie's motion. It explained that pre-trial motions to dismiss in criminal cases are limited to matters on the face of the indictment. The trial court held that McKenzie's claims would require it to look past the face of the complaint and consider the quantum of evidence.

### B. The case is tried to the bench.

**{¶ 7}** The case was tried to the bench on August 23, 2023. According to the evidence presented at trial, McKenzie and A.U. met in January of 2022, while they were hospitalized together. They grew close in the hospital and even talked about getting married and having children together. Both were released the same day, and McKenzie told A.U. that he had no place to go. A.U. said that he could stay with her. She testified that she considered McKenzie her boyfriend.

**{¶ 8}** Soon after McKenzie began staying with A.U., they picked up McKenzie's prescriptions from the pharmacy. A.U. noted that McKenzie had numerous prescriptions,

3.

so she asked him what kind of health issues he had. McKenzie told her that he had only high blood pressure. A.U. thought that McKenzie had too many prescriptions for just high blood pressure, so when McKenzie went to work, she googled the medications and learned that at least one of the medications was prescribed for HIV.

{¶ 9} A.U. became very upset upon learning that McKenzie was being treated for HIV. They had had vaginal and oral sex three or four times while he stayed with her, including one time after A.U. asked McKenzie about his health issues. Although A.U. had condoms available and inquired about using a condom, McKenzie did not want to use one because he does not like condoms; he ejaculated inside of A.U.

{¶ 10} A.U. went to the emergency room. Blood tests were administered that day and repeated for three months. A.U. tested negative for HIV. ER personnel told her that it is against the law for someone with HIV to have sex with another person without first disclosing the condition. A.U. reported the incident to the sheriff's office.

{¶ 11} When A.U. got home, she put McKenzie's things outside and told him that the relationship was moving too fast. McKenzie left. Sometime thereafter, A.U. asked McKenzie whether he had anything he wanted to tell her. He said that he had been honest with her and had nothing to say.

{¶ 12} Before coming to stay with A.U., McKenzie told her that he had a felony assault conviction stemming from a bar fight. She later learned that the felony assault conviction stemmed from another incident where he engaged in sexual intercourse with a

4.

woman—his now ex-wife—without disclosing that he was HIV positive.  He served prison time for the offense.  Court records from that conviction indicate that McKenzie became aware of his condition in 2004.  His prior judgment of conviction was dated October 28, 2011.

{¶ 13} McKenzie presented testimony from one of his treating physicians, Thomas File, Jr., M.D., who is an infectious disease specialist.  Dr. File submitted a letter indicating that a person who is HIV positive cannot transmit the disease to another person through sexual intercourse when he or she has undetectable levels of the virus.  The virus is considered "undetectable" at levels of less than 20 copies per milliliter.  McKenzie had undetectable levels of the virus on March 11, 2019, October 10, 2019, November 9, 2020, January 3, 2022, and February 17, 2022.  McKenzie and A.U. engaged in sexual intercourse between January 24 to 27, 2022.  Dr. File testified that McKenzie could not have transmitted HIV to A.U. during that period.

{¶ 14} Dr. File acknowledged that on August 25, 2022, McKenzie had a virus level of 212 copies per milliliter, but he explained that a recent study has shown that there is an "almost zero risk" of transmitting the virus at levels of less than 1,000 copies per milliliter, and a zero risk of transmitting it at 600 copies per milliliter or less.  He testified that McKenzie could not have transmitted the virus to A.U. even with a virus level of 212 copies per milliliter.  Dr. File clarified that in the past, levels of 200 copies per milliliter, and even levels of 1,000 copies per milliliter, were considered "undetectable," but

5.

increased sensitivity of tests now makes it possible to "detect" the virus with levels of 20 copies per milliliter. The virus is not capable of being transmitted at those levels, however.

{¶ 15} On cross-examination, Dr. File admitted that McKenzie is an individual who carries a virus that causes acquired immunodeficiency syndrome. He explained that there is no cure for HIV, so once a patient is infected, he or she remains infected; however, with treatments, they can control the virus and reduce the viral load. Dr. File described circumstances that can affect one's viral load such as not taking medication, taking a medication that interferes with HIV medications, mutation of the virus, and the development of resistance to the standard therapy (which he explained is less likely now than it was two decades ago because more effective, more potent antiretroviral agents are now used). With HIV patients, Dr. File generally sees them twice a year and tests their levels before seeing them. He acknowledged that if a patient stops taking their medications, their viral load may "spike," but he clarified that that usually takes some time after stopping medication; this is why he likes to see patients twice a year.

{¶ 16} Dr. File started seeing McKenzie in 2010, and his viral load was higher then. He estimates that it took six to eight months to get McKenzie's virus levels to undetectable. McKenzie has been compliant with his treatment other than one time when he was incarcerated and one time when he was hospitalized and was off therapy for about a week. McKenzie's tests showed undetectable levels of the virus over a period of time,

6.

and there were no problems with the virus mutating, his medications interacting, or him failing to take his medication. Dr. File recalled that when McKenzie's levels increased slightly on August 25, 2022, it was the result of an upper respiratory infection. He described this as a "blip" that resolved when the upper respiratory infection resolved. By November of 2022, McKenzie's viral load dropped back down to 26 copies per milliliter, and earlier in 2023, it was undetectable again, meaning it was below 20.

{¶ 17} Dr. File said based on the tests performed in January and February of 2022, McKenzie would have known that his viral load was undetectable and nontransmissible because Dr. File provides this information to patients every time he sees them. He testified that even if McKenzie had stopped taking his medication, his viral load would not have increased to a transmissible level between January and February of 2022.

### C. The parties briefed closing arguments.

{¶ 18} Instead of orally presenting their closing arguments, the parties submitted briefs. The State argued that McKenzie tested HIV positive in 2003; he knew that he was legally required to disclose his HIV positive status to sexual partners because he had a prior conviction for failing to do so; the law does not distinguish between detectable and nondetectable levels of the virus; and McKenzie had sex with A.U. without disclosing his HIV positive status.

{¶ 19} The State maintained that R.C. 2903.11(B)(1) is rationally related to the State's legitimate government interest in curbing HIV transmission to sexual partners. It

7.

argued that the statute must be upheld if there is any reasonably conceivable set of facts that can provide a basis for the classification here—i.e., persons who have tested HIV positive. It emphasized that McKenzie will have HIV for life, many external factors could affect the efficacy of his medications, viral loads can fluctuate between appointments, and a small possibility exists for transmitting HIV even with low, undetectable levels. The State claimed that "there is no absolute guarantee that a person with a low viral load will not transmit the virus to a sexual partner."

{¶ 20} Finally, the State maintained that this was a more egregious form of the offense because of McKenzie's prior conviction, his refusal to wear a condom, and his dishonesty when confronted by A.U.

{¶ 21} McKenzie argued that when he had sex with A.U.—between January 24-27, 2022—he knew his viral load was undetectable and he was unable to transmit the virus, as corroborated by testing performed by his physician. He highlighted Dr. File's testimony indicating that the risk of transmission is nearly zero at 1,000 copies per milliliter, and zero at under 600 copies per milliliter. His viral load was under 20 copies per milliliter at all relevant times, and only 212 in August of 2022—still not capable of transmission. McKenzie acknowledged that certain factors may play a role in increasing one's viral load, but he insisted that Dr. File confirmed that none of these factors played a role here because "McKenzie was compliant, and his ongoing testing demonstrated and corroborated that he continued testing at thresholds which were either undetectable and

8.

untransmittable, or even if detectable, such as 8/25/22, . . . still untransmittable." He emphasized that his viral levels were under 20—undetectable—26 days before and 20 days after the sexual conduct here, and Dr. File made clear that there was no chance of a "spike" in the intervening days.

{¶ 22} McKenzie pointed out that the State offered no evidence to dispute Dr. File's testimony. He argued that he was not a "carrier" of HIV because he could not transmit the disease. And he maintained that he knew that he could not have carried the virus in January of 2022, because Dr. File told him his status after every test.

{¶ 23} As he did in his motion to dismiss, McKenzie argued that R.C. 2903.11(B)(1) violated his right to equal protection and freedom of speech. He insisted that "there is no rational basis for a distinction between an undetectable person who is incapable of transmitting the virus and a person who never tested positive for HIV at all, and who would therefore not be subject to prosecution for such an offense." He argued that he should be treated similarly to a person who has never tested positive.

{¶ 24} McKenzie acknowledged that the Ohio Supreme Court considered constitutional challenges to the statute in *State v. Batista*, 2017-Ohio-834 (summarized later in this decision), but he maintained that those arguments were distinguishable from his arguments here. He further argued that strict scrutiny should be applied here—not rational basis—because the statute interfered with his fundamental right to the privacy of his medical information. He claimed that the statute cannot withstand even a rational-

9.

basis analysis because he could not have transmitted the disease here, so the State had no legitimate interest in applying this statute to him. McKenzie urged that the statute is arbitrary, capricious, and irrational as applied to people like him, who have undetectable, nontransmissible levels of the virus.

{¶ 25} Finally, McKenzie argued that R.C. 2903.11(B)(1) compels speech, contravening his right to freedom of speech. And he argued that R.C. 2903.11(B)(1) is contrary to public policy insofar as it (1) stigmatizes individuals with serious medical conditions when the virus is not capable of being transmitted, (2) is detrimental to the legitimate governmental interest in preventing the spread of HIV because it discourages testing, (3) ignores current scientific and medical evidence, and (4) ignores guidance from leading authorities on treatment and prevention of HIV, which oppose criminalization of nondisclosure in favor of education and treatment initiatives that have proven successful.

### D. The trial court finds McKenzie guilty and sentences him.

{¶ 26} After considering the parties' closing arguments, the trial court, in a written verdict, found McKenzie guilty. The court observed that McKenzie was diagnosed with HIV in 2003, and was convicted of felonious assault in Columbiana County on January 20, 2010.

{¶ 27} The court found that the State presented unrefuted testimony that A.U. and McKenzie met in January of 2022, they started a sexual relationship soon after,

10.

McKenzie knew he had tested HIV positive, McKenzie did not disclose this to A.U., and McKenzie misled A.U. when she asked about the medications he was taking. As such, the court concluded that McKenzie knew he tested positive as a carrier of a virus that causes AIDS and knowingly engaged in sexual conduct with A.U. without first disclosing this knowledge to her.

{¶ 28} The court highlighted Dr. File's testimony conceding that McKenzie is a carrier of a virus that causes AIDS. It acknowledged that Dr. File testified that at least since the beginning of 2022, McKenzie has been testing in a range that is classified as undetectable, and with a viral load classified as undetectable, McKenzie cannot transmit the virus through sexual conduct. Nevertheless, it concluded that the intent of the statute is to give notice to a potential sexual partner of a person's diagnosis. And while science has advanced in the two decades since the statute was drafted, the court recognized that "the principle of notice and consent persists," and the statute makes no exception in cases where transmission is impossible. The court rejected McKenzie's position that R.C. 2903.11(B)(1) violates Equal Protection and cannot survive strict scrutiny or even a rational-basis analysis. It reasoned that while drug therapy has rendered McKenzie's viral load undetectable and not capable of transmission, disruption to drug therapy could result in detectable, transmissible viral loads.

{¶ 29} The court sentenced McKenzie to a minimum term of imprisonment of five years and a maximum term of seven and one-half years. McKenzie's conviction and sentence were memorialized in a judgment journalized on October 18, 2023.

{¶ 30} McKenzie appealed. He assigns the following errors for our review:

I. The State failed to present sufficient evidence to sustain the conviction under the Ohio and United States constitutions and/or the conviction stands against the manifest weight of the evidence[.]

II. As argued below, R.C. Sect. 2903.11(B), as applied, violates equal protection under the Ohio and United States constitutions and is therefore void[.]

III. R.C. Sect 2903.11(B), as applied, constitutes compulsory speech and is void under the U.S. First Amendment[.]

## II. Law and Analysis

{¶ 31} In his first assignment of error, McKenzie challenges both the sufficiency and weight of the evidence. In his second and third assignments of error, he challenges the constitutionality of R.C. 2903.11(B), as applied, arguing that the statute violates the rights to equal protection and freedom of speech, respectively. We consider each of his assignments in turn.

## A. Sufficiency and Weight

{¶ 32} In his first assignment of error, McKenzie argues that his conviction is against the sufficiency and weight of the evidence. He claims that the uncontroverted evidence was that at all relevant times, he knew his viral load was at a level deemed by his physician as "undetectable," and he was unable to transmit the virus. As such, he maintains, he was not a "carrier" of the virus for purposes of R.C. 2903.11(B)(1). He insists that the trial court improperly interpreted "has tested positive as a carrier" to mean "has been diagnosed." He contends that unlike when the statute was drafted, one can now cease to be a carrier of the virus, thereby creating "an ambiguity as to what the statute actually means tense wise." In fact, he claims that had he tested at the time of his relationship with A.U., he would not have tested positive as a carrier.

{¶ 33} The State responds that it is undisputed that McKenzie has HIV, he engaged in sexual activity with A.U., and he did not disclose to A.U. that he has HIV. It maintains that because there is no cure for HIV, McKenzie will always be a carrier of the virus, and he did not know his exact viral load level at the time he engaged in sex with A.U. The State emphasizes that R.C. 2903.11(B)(1) makes no distinction between "positive for HIV but not detectable" versus "positive and detectable."

{¶ 34} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 35} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

14.

{¶ 36} Under R.C. 2903.11(B)(1), "[n]o person, with knowledge that the person has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome, shall knowingly . . . [e]ngage in sexual conduct with another person without disclosing that knowledge to the other person prior to engaging in the sexual conduct[.]" Importantly, "the State is not required to prove under the felonious assault statute that the victim contracted HIV from the defendant." *State v. Bean*, 2014-Ohio-908, ¶ 16 (9th Dist.).

{¶ 37} McKenzie concedes that he "previously" tested positive for HIV and that he did not disclose this to A.U. He emphasizes, however, that currently he tests "undetectable" and is unable to transmit the virus. He maintains that "he specifically did NOT have knowledge that he would test positive as a carrier of HIV at any of the times in question." To the contrary, he insists, he was specifically told that he would *not* transmit the disease, and is, therefore, not a "carrier" under the plain meaning of the word.

{¶ 38} McKenzie acknowledges that given the grammatical tense of the statute ("has tested positive as a carrier"), it could be interpreted as requiring him to give notice of his prior status, but he suggests that the legislature intended only for "current carriers"—i.e., "those able to transmit the virus"—to disclose their status to sexual partners. As such, he insists, the statute should be construed to apply only to those who know that they would test positive at the time of the alleged violation.

15.

{¶ 39} The language of the statute requires a person who *has tested positive as a carrier* to disclose this information to sexual partners. This means that disclosure must be made if the person has tested positive as a carrier at any time—not whether they *would* test positive as a carrier if tested at the time of a sexual encounter. Here, Dr. File clearly testified that McKenzie has tested positive as a carrier of HIV, a virus that causes AIDS. Dr. File began treating McKenzie in 2010 and at that time, his viral load was elevated. While Dr. File explained that tests are now more sensitive and can detect previously-undetectable levels of the virus, he clarified that once a person becomes infected with HIV, they will always have it—there is no cure. ( "I just want to make it clear that once a patient is infected with HIV, although we can control the virus and lower the viral load, they're still infected with the virus . . . .") In fact, one's viral load—and with it, his or her ability to transmit the virus—is largely dependent on their continuing to treat the virus with medication. Dr. File acknowledged that without treatment, McKenzie's viral load could increase and his HIV could progress. Dr. File's undisputed testimony makes clear that McKenzie remains a carrier of the HIV virus.

{¶ 40} It is widely known that since R.C. 2903.11(B)(1) was enacted, significant advancements have been made in detecting and treating HIV. *See State v. Batista*, 2017-Ohio-8304, ¶ 26. But the current version of the statute does not distinguish between viral loads that are detectable versus undetectable or transmissible versus nontransmissible. It applies to persons who have tested positive as a carrier of a virus that causes acquired

16.

immunodeficiency syndrome.  Once a person learns that they have tested positive as a carrier of a virus that causes AIDS, under the plain language of the statute, he or she remains responsible for disclosing this status to a sexual partner before engaging in sexual conduct.  The statute makes no provision releasing a person from this obligation following successful medical management of the virus.  Any changes to this requirement must be made by the legislature.

{¶ 41} The undisputed evidence presented at trial demonstrates that McKenzie tested positive as a carrier of HIV and he did not disclose this to A.U. before engaging in sexual conduct with her.  There was sufficient evidence to support his conviction and his conviction was not against the manifest weight of the evidence.  We find McKenzie's first assignment of error not well-taken.

### B.  Equal Protection

{¶ 42} In his second assignment of error, McKenzie argues that as applied, R.C. 2903.11(B)(1) violates his right to equal protection under the Fourteenth Amendment to the U.S. Constitution and Article I, § 2 of the Ohio Constitution.  He maintains that the compelled disclosure of his private medical information is not consistent with any legitimate government interest because the virus was undetectable and nontransmissible during the period in question.  While McKenzie agrees that the State has a legitimate interest in preventing the spread of HIV, he insists that as applied to him and individuals like him—those who once tested positive but are now unable to transmit the virus

17.

because their viral loads are so low as to be undetectable—the statute bears no rational relationship to any legitimate state interest. He also suggests that strict scrutiny should be applied because the statute implicates his fundamental rights.

{¶ 43} McKenzie acknowledges that the Ohio Supreme Court in *Batista*, 2017-Ohio-8304, ¶ 28, held that R.C. 2903.11(B)(1) does not violate the right to equal protection "because it is rationally related to the state's legitimate interest in preventing the transmission of HIV to sexual partners who may not be aware of the risk." In *Batista,* the defendant was charged with violating R.C. 2903.11(B)(1) after having sex with a woman without first disclosing that he had tested positive for HIV. He moved to dismiss the charge, and the trial court conducted a hearing on the motion. The defendant presented testimony from an infectious diseases specialist who testified that "the lifetime survival rate of those diagnosed with HIV who receive treatment is now comparable to the survival rate of people who do not have HIV." *Id.* at ¶ 8. She acknowledged that while HIV can be treated, there is no cure. She compared HIV to Hepatitis C, although she noted that there are medicines that can cure Hepatitis C and it is more commonly spread through needles.

{¶ 44} The trial court denied the defendant's motion to dismiss. On appeal to the Ohio Supreme Court, he argued that R.C. 2903.11(B)(1) violates equal protection because there is no rational basis for a distinction between individuals who are HIV positive and those with other infectious diseases like Hepatitis C. He maintained that the

18.

statute singles out HIV and is motivated by an outdated stigma surrounding the virus. He also argued that the statute does not prevent the spread of HIV and actually discourages people from getting tested for the virus. And given that HIV can also be transmitted by other means, like needles, he claimed that there is no rational basis for a distinction between the methods of transmitting HIV.

{¶ 45} The Court analyzed the defendant's challenge under a rational-basis analysis. It recognized that under a rational basis analysis, a classification "'must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at ¶ 22, quoting *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58 (1999), quoting *Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). This is true even if the legislative choice is based only on rational speculation that is unsupported by evidence or empirical data. *Id.*

{¶ 46} The Court observed that the federal Equal Protection Clause does not forbid classification, so long as it is related to the purpose of the law. It found that the classification the defendant challenged—i.e., "individuals with knowledge of their HIV-positive status who fail to disclose that status to someone prior to engaging in sexual conduct with that person"—furthers the valid state interest in "curbing HIV transmission to sexual partners who may not be aware of the risk." *Id.* at ¶ 23. The Court declined the

defendant's invitation "to weigh the wisdom of the legislature's policy choices." *Id.* at ¶ 24.

{¶ 47} Finally, the Court explained that because a rational basis exists for the classification, the statute is not rendered invalid merely because the statute does not address *other* sexually-transmitted diseases or methods of transmitting HIV. The Court acknowledged that advancements in the treatment of HIV have "reduced the transmission and mortality rates associated with the disease," but concluded that a plausible policy reason for the classification still exists and the relationship between the classification and the policy goal is not arbitrary or irrational. *Id.* at ¶ 26.

{¶ 48} McKenzie urges that the State's interest in curbing transmission of HIV is not furthered as applied here because he is not capable of transmitting the virus. Essentially, he argues that he and individuals like him—i.e., people who have tested HIV positive but have undetectable levels of the virus—should be treated like those who have never tested positive.

{¶ 49} The State responds that an HIV patient's decreased viral load at an annual appointment does not guarantee that the patient will continue to have that same decreased viral load at some other point in time. Factors such as the patient's compliance with treatment and the presence of other infections may increase a patient's viral load and potentially put others at risk of contracting the virus. The State insists that until there is a cure for the virus, the risk of transmission will always be present.

20.

{¶ 50} The Equal Protection Clauses of the Ohio and U.S. Constitutions "require that all similarly situated individuals be treated in a similar manner." *Columbia Gas Transm. Corp. v. Levin,* 2008-Ohio-511, ¶ 90, citing *McCrone v. Bank One Corp.,* 2005-Ohio-6505, ¶ 6. "A statute may be challenged as unconstitutional on the basis that it is invalid on its face or as applied to a particular set of facts." *State v. Lowe*, 2007-Ohio-606, ¶ 17, citing *United States v. Eichman*, 496 U.S. 310, 312 (1990). "In an as-applied challenge, the challenger 'contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, [is] unconstitutional.'" *Id.,* quoting *Ada v. Guam Soc. of Obstetricians & Gynecologists*, 506 U.S. 1011 (1992) (Scalia, J., dissenting).

{¶ 51} Here, Dr. File authored a letter and testified for the defense. His letter, admitted as Exhibit A, states that "people cannot pass HIV through sex when they have undetectable levels of HIV," and according to his records, McKenzie had undetectable levels of the virus on March 11, 2019, October 10, 2019, November 9, 2020, and most important to this case, on January 3, 2022, and February 17, 2022. McKenzie and A.U. engaged in sexual conduct January 24 to 27, 2022.

{¶ 52} Dr. File reiterated at trial that McKenzie was incapable of transmitting the virus on the dates at issue. He explained that "a variety of studies from the last decade" show "that it's been well documented that if patients have less than 200 copies per ml, that there's no risk of sexual transmission. . . ." He described a newly-published study

21.

that followed 7,000 discordant couples (where one partner is positive and the other partner is negative) and found that there was "almost 0 risk of sexual transmission of HIV with viral loads of less than 1,000 copies per ml" and zero risk with viral loads of less than 600 copies per milliliter:

> Q: [I]t is fair to say that based on that recent data, under 600 copies per milliliter is 0 chance of transmission?
>
> A: Well, as best as we can say, 0, I can tell you in medicine it's very difficult to say 0, very difficult to say a hundred percent, but as best as we can say that, and based on the science, that's true.
>
> Q: So to a reasonable degree of medical certainty that would be true?
>
> A: Correct.

He went on to explain that "[t]hese data provide a powerful opportunity to destigmatize HIV and promote adherence to antiretroviral therapy to dissemination of dispositive public health message (sic)."

{¶ 53} Dr. File said that he sees patients twice a year. He agreed that it is possible—but would be unusual—for their viral levels to "spike" between visits "because it usually takes some time after they stop their medication before [they] see an increase in the virus." He agreed that if he sees a patient in January, and not again until August, there could be a spike in the viral load in between visits that would resolve by the time he

22.

sees the patient. However, Dr. File pointed out that in this case, McKenzie was tested in both January and February of 2022, and had undetectable levels of the virus, and even if he stopped medication sometime between those two tests, he would not anticipate a significant jump in viral load in that short a period of time. Dr. File confirmed that he did not have compliance issues with McKenzie.

{¶ 54} On cross-examination, Dr. File agreed that some external factors may decrease the efficacy of prescribed medication such as mutation of the virus, viral illnesses (like an upper respiratory infection), or drug interactions. But he also said that mutations of the virus have not been a problem in the last two decades and McKenzie has experienced no medication interactions.

{¶ 55} While Dr. File acknowledged that McKenzie had a viral level of 212 on August 25, 2022—a "detectable" level—he explained that even this viral load would not allow for transmission of the virus. He also emphasized that by November of 2022, McKenzie's viral load was back down to 26, and under 20 by the beginning of 2023.

{¶ 56} Having said all this, Dr. File did testify that once infected, McKenzie will remain infected, he *does* carry a virus that causes AIDS, and he cannot be cured. He verified that without medication, McKenzie could get sicker and the HIV could progress. The evidence in this case clearly established that there is currently no cure for HIV, and if McKenzie were to become non-compliant with medical treatment, his viral load could increase over time. While Dr. File testified that an increase in viral load is generally

23.

gradual, he explained that even common ailments like an upper respiratory infection can cause an increase.

{¶ 57} In *Merithew v. Whitmer*, 2019 WL 2209128 (E.D.Mich. February 22, 2019*), report and recommendation adopted*, 2019 WL 1219409 (E.D. Mich. Mar. 15, 2019), Merithew was convicted under a similar Michigan statute. He filed in federal district court, challenging the constitutionality of that statute on the basis that "someone like [him] who has an 'undetectable viral load' is 'unable to transmit HIV[.]'" *Id.* at * 2. He argued that "there is a new viral class of HIV patients who are non-infectious," and the Michigan statute "was not narrowly tailored enough to exclude those who cannot transmit HIV sexually," therefore, the law violated his right to due process and his rights to free speech and privacy. *Id.* The federal court found that it had no authority to consider an as-applied challenge to the state statute. *Id.* at * 3. But it also pointed out that its research had revealed no case law supporting Merithew's contention that the statute is unconstitutional. The court acknowledged that "the topic has captured some discussion in law review articles," but it observed that Merithew's *"*perspective has not yet attained any precedential support." *Id.* at * 2.

{¶ 58} Similarly, in *Howton v. State,* 619 S.W.3d 29 (Ark.App. 2021), the defendant was convicted under a similar Arkansas statute. He argued that "due to the vast medical and scientific advancements in the treatment for HIV," the risks associated with HIV exposure were "'far less grave and potentially nonexistent when one's viral

24.

HIV load is 'undetectable,'" thus conviction of a class A felony "constitute[d] cruel and/or unusual punishment because the punishment doesn't fit the crime.'" *Id.* at 35. He also alleged that "treating him differently by exposing him to such grave punishment violate[d] due process and equal protection of the law." *Id.*

{¶ 59} The appellate court upheld Howton's conviction. It recognized that the State has a legitimate public interest in stopping the spread of HIV, and "despite the medical advances in treatment, HIV remains incurable, costly, and life threatening." *Id.* at 36. Citing *State v. Batista,* 2016-Ohio-2848 (1st Dist.), it found that the HIV-exposure statute did not involve a fundamental right and HIV-positive persons are not a suspect class, thus the statute would be deemed constitutional "if there is *any reasonably conceivable fact situation* that demonstrates the possibility of a deliberate nexus between state objectives and the classification in question. . . ." (Emphasis sic.) The court recognized that the requirement that an HIV-positive individual disclose his or her status to a prospective sexual partner before engaging in sexual conduct is rationally related to stopping the spread of HIV, and Howton bore the burden "to negate every conceivable rational basis that might support the classification." *Id.* It explained that "[r]ational-basis review does not require that the challenged legislation be a perfect fit or exact fit between the means used and ends sought. . . . Moreover, the fact that HIV is more easily treatable now than in the past does not change [its] analysis." *Id.* The court concluded that there is "a rational relation between preventing the spread of HIV and requiring

25.

disclosure of an HIV-positive status before engaging in sexual conduct," thus the statute did not violate the right to equal protection, regardless of whether the defendant had an undetectable viral load. *Id.*

{¶ 60} Given that there is no cure for HIV—and given that external factors (such as common viral infections or drug interactions) may decrease the efficacy of prescribed medication—we, like the courts in *Batista*, *Merithew*, and *Howton*, simply cannot say that there is no conceivable rational relationship between preventing the spread of HIV and requiring *all* HIV carriers, including those, like McKenzie, with a fairly-recent test showing an undetectable viral load, to disclose their HIV-positive status before sex. This is an issue that requires broader input from the medical community, and such intricate policy determinations are squarely not within the domain of the courts.

{¶ 61} We find McKenzie's second assignment of error not well-taken.

## C. First Amendment

{¶ 62} In his third assignment of error, McKenzie argues that as applied, R.C. 2903.11(B)(1) constitutes compulsory speech that violates his right to free speech under the First Amendment to the U.S. Constitution and Article I, § 11 of the Ohio Constitution. McKenzie contends that because he was not a carrier capable of transmitting HIV at the time of the incident here, he did not engage in any conduct that impacted a state interest. He further claims that he was not "HIV positive" before engaging in sexual conduct with A.U.

26.

{¶ 63} McKenzie acknowledges that the Ohio Supreme Court in *Batista* held that R.C. 2903.11(B)(1) does not violate the right to freedom of speech "because it regulates conduct and any speech compelled by the statute is incidental to the regulated conduct." *Id.* at ¶ 28. In *Batista,* the defendant recognized that the state has a compelling interest in reducing or stopping the spread of HIV and other infectious diseases, but argued that R.C. 2903.11(B) must be reviewed employing strict scrutiny because the statute compels content-based speech and implicates a fundamental right. He maintained that "the statute fails under strict scrutiny review because it is not narrowly tailored to further a compelling government interest" because "it does not prevent the spread of HIV, it compels speech even when the sexual conduct or bodily fluids cannot transmit HIV, and its existence is not necessary to prosecute HIV positive individuals for exposing people to HIV." *Id.* at ¶ 13.

{¶ 64} The Court explained that "[t]he First Amendment does not prevent statutes regulating conduct from imposing incidental burdens on speech." *Id.* at ¶ 17, citing *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006), quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Relying on rationales from courts in Missouri and Illinois, both of which considered similar statutes, the Court found that the obligation of an individual who knows he or she is HIV positive to disclose that status if they choose to engage in sexual conduct with another person, is merely "incidental to the statute's regulation of the targeted conduct." *Id.* at ¶ 21. "Thus,

27.

it concluded, R.C. 2903.11(B)(1) "regulates conduct, not speech, and therefore does not violate the First Amendment right to free speech." *Id.*

{¶ 65} McKenzie attempts to distinguish the present matter from *Batista* with the same argument he makes in challenging the statute on equal protection grounds: that he was not a carrier capable of transmitting HIV when he engaged in sexual conduct with A.U. But the Ohio Supreme Court in *Batista* made clear that R.C. 2903.11(B)(1) regulates *conduct*—not *speech.* As such, a First Amendment challenge to the statute necessarily fails, regardless of whether it is applied to persons whose viral loads are too low to transmit the virus to sexual partners.

{¶ 66} We find McKenzie's third assignment of error not well-taken.

### III. Conclusion

{¶ 67} The State presented evidence, confirmed by McKenzie's treating physician, demonstrating that McKenzie knew he had tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome. It is undisputed that he knowingly engaged in sexual conduct with A.U. without first disclosing this information to her. His conviction is supported by sufficient evidence and is not against the weight of the evidence. We find McKenzie's first assignment of error not well-taken.

{¶ 68} Although McKenzie provided credible evidence that at the time he engaged in sexual conduct with A.U. he was unable to transmit HIV due to undetectable viral loads, R.C. 2903.11(B)(1) is rationally related to the State's legitimate interest in curbing

28.

transmittal of HIV and does not violate the right to equal protection. We find McKenzie's second assignment of error not well-taken.

{¶ 69} The Ohio Supreme Court has already determined that R.C. 2903.11(B)(1) regulates conduct, not speech. Accordingly, it does not, as applied, violate McKenzie's right to freedom of speech. We find McKenzie's third assignment of error not well-taken.

{¶ 70} We affirm the October 18, 2023 judgment of the Sandusky County Court of Common Pleas. McKenzie is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

_____
JUDGE

Gene A. Zmuda, J.

_____

Charles E. Sulek, P.J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.